# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

**FILED**
FEB 17 2011
MAGISTRATE JUDGE P. MICHAEL MAHONEY
United States District Court

UNITED STATES OF AMERICA

v.

PAUL JOSEPH CIRIGLIANO,
also known as Paul Cirano
(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 11 CR 50014

I, EDUARDO M. ANDRADE, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief:

Between as early as 2009, and continuing to February 17, 2011, in Wauconda, the Northern District of Illinois, and elsewhere, Paul Joseph Cirigliano, also known as Paul Cirano, devised and participated in a scheme to defraud and to obtain money from individuals by means of materially false and fraudulent pretenses, representations, and promises, and on or about March 26, 2009, at Wauconda, in the Northern District of Illinois, for the purpose of executing the aforesaid scheme and to obtain money, knowingly did cause to be delivered by United States mail an envelope containing a personal check drawn upon the account of an individual referred to as "Investor A," the envelope being addressed to Cirigliano's address on N. Route 59, Wauconda, Illinois, 60084, and said check representing an investment the defendant received from Investor A, in violation of 18 U.S.C. § 1341.

I further state that I am a Postal Inspector with the U.S. Postal Inspection Service and that this complaint is based on the facts set forth in the attached affidavit.

Continued on the attached sheet and made a part hereof: _x_ Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

February 17, 2011
Date

at Rockford, Illinois
City and State

P. Michael Mahoney, Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

| | |
|---|---|
| NORTHERN DISTRICT OF ILLINOIS | ) |
| | ) ss. |
| WINNEBAGO COUNTY | ) |

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, EDUARDO M. ANDRADE, being duly sworn on oath, hereby depose and state the following:

1. I am a United States Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since September 1998. I am currently assigned to the Chicago Division of USPIS. My primary duties include investigating criminal violations of laws involving the United States Mail including, but not limited to, mail fraud as set forth in Title 18, United States Code, Section 1341. In my capacity as a Postal Inspector, I also investigate bank fraud, money laundering and other financial crimes. I have received specialized training in the enforcement of federal laws and have been involved in various investigations involving postal crimes. I have initiated and participated in criminal investigations involving the execution of search warrants, the review of subpoenaed financial documents, physical surveillance, and arrests.

2. Since approximately September of 2009, I have been involved in the investigation of Paul Joseph Cirigliano, also known as Paul Cirano (hereinafter referred to as Cirigliano unless otherwise noted). Brandon Lanham, a Special Agent with the Illinois Department of Securities, and other postal inspectors have participated in the investigation, and I have discussed the results of their investigation with them. This affidavit is based in

part upon those discussions, in part upon my own investigation and observations, and in part upon the review of documents that I have received.

3. This affidavit is made in support of a complaint and arrest warrant charging Cirigliano with mail fraud in violation of Title 18, United States Code, Section 1341. Because of the limited purpose of this affidavit, I have not set forth all of the information known to me concerning this investigation. I have set forth only those facts that I believe establish probable cause to believe that Cirigliano committed the offense alleged in the complaint.

4. As further set forth herein, the criminal complaint alleges that Cirigliano devised and participated in a scheme to defraud and to obtain money by means of materially false and fraudulent pretenses, representations and promises from various individuals. For the purpose of executing, and attempting to execute, the scheme, on or about March 26, 2009 Cirigliano caused to be delivered by United States mail a personal check drawn on the bank account of an investor (hereinafter "Investor A") at Cirigliano's business address in Wauconda, Illinois.

## Overview of the Scheme

5. As set forth in more detail below, from at least 2009 to the present, Cirigliano devised and participated in a fraudulent investment scheme relating to the promised buying and selling of used analog video production equipment. During the scheme, Cirigliano provided potential investors with materially false and fraudulent information concerning,

among other things, how he would use investor funds and the safety of the principal of their investments.

6. Cirigliano promised and represented to potential investors that their funds would be used to invest in the purchase of used analog video production equipment from television companies located in the United States. Cirigliano told investors that he would then sell this equipment to smaller companies in the United States and/or companies in South America that could still use the outdated analog equipment. Cirigliano promised investors a high rate of return. In some instances, Cirigliano promised as much as a 20% return in just 30 days. Cirigliano represented to potential investors that after a set period of time, they could either receive back the principal and interest on their investments or they could "roll-over" both the principal and promised interest.

7. Cirigliano advised investors that the risk on their investment would be very low as he could sell the equipment at least for the same amount for which he purchased it. Cirigliano said that he would personally guarantee the safety of the investor's funds and that his companies would guarantee the investors' funds as well. During the course of the scheme, Cirigliano, using the name Cirano, provided Demand Notes and/or Promissory Notes to investors to reflect their investments. Cirigliano signed the Demand Notes and Promissory Notes (hereinafter referred to as "Notes") personally and on behalf of Panoptic Corporation or on behalf of Panoptic Studios, Inc.

8. Based on Cirigliano's representations, beginning at least as early as 2004 and continuing until at least June 2010, Cirigliano received a total of approximately $1.8 million from approximately 40 investors. Rather than invest these funds in the purchase of used analog video equipment as represented to investors, Cirigliano used the vast majority to make Ponzi-type payments to investors to keep his scheme afloat.

9. As a part of his scheme, Cirigliano provided investors with new Notes which would reflect investments and interest that had been rolled over. These new Notes acted to lull investors into falsely believing that their investments had been profitable and had earned positive rates of return. However, as detailed more fully below, Cirigliano did not purchase any analog video production equipment. As a result, when investors would seek payment on their Notes for principal and/or the purported interest, Cirigliano would use funds raised from newer investors to pay off older investors. On some occasions, Cirigliano was unable to pay off the Notes and, as set forth below, would send to investors checks for which there were insufficient funds in the account to honor.

10. Cirigliano is a resident of Fox River Grove, Illinois. Investors have advised law enforcement that Cirigliano has represented himself to be the President and owner of Panoptic Studios, Inc.. According to the website for Panoptic Studios, Inc., that company is a film, video, interactive motion graphics, and web site production company located in Wauconda, Illinois. Panoptic Studios, Inc. is a preferred vendor for Proforma, a national

supplier of print and promotional products in the United States. Many of Cirigliano's investors were Proforma franchise owners.

11. Part of the services Panoptic Studios, Inc. provided the Proforma community was to conduct multimedia certification courses. These certifications were required by Proforma in order for the franchise owners and sales representatives to be able to sell multimedia products to their customers. During these certification courses, Cirigliano met and befriended Proforma franchise owners. Cirigliano used the high reputation that Panoptic Studios, Inc. had among the Proforma community to solicit investors for the above mentioned scheme.

**Investor A**

12. Another law enforcement officer and I have interviewed and received documents from Investor A. Investor A is a resident of Mineral Point, Wisconsin. Investor A advised that between 2004 and the present, he had invested approximately $169,700 with Cirigliano for the purpose of Cirigliano's purchase and sale of used analog video production equipment. Investor A advised me that he made approximately 18 investment contributions to Cirigliano. Investor A said he either wrote checks to Cirigliano and mailed them via the United States mail to Cirigliano or he would wire transfer his investments to a bank account controlled by Cirigliano. After each contribution, Cirigliano mailed to Investor A either a Demand Note or a Promissory Note using either the United States mail or Federal Express. Investor A wrote a $6,000 check dated March 25, 2009, payable to Panoptic Corp. and

mailed the check to Cirigliano. Bank records from Home State Bank revealed that Investor A's check was split-deposited into three different accounts for Panoptic Studios, Inc.: a Special Account; a Payroll Account; and a regular account. Following the deposits, the bank records do not reflect that Cirigliano purchased video equipment. Instead, the records reflect that Investor A's funds were used along with other monies in the accounts to pay for Cirigliano's personal expenses. For example on March 30, 2009, funds from the regular account were used to make a car payment for $863.61 to Capital One Auto.

13. Investor A advised me that in approximately August of 2010, Investor A sought to redeem all of his investments, both principal and interest, from Cirigliano. According to Investor A, Cirigliano has not paid Investor A for the remainder of the investment, either principal or interest. Investor A said that Cirigliano owes him approximately $84,570 in principal alone.

### Investor B

14. I have interviewed and received documents from Investor B. Investor B is a resident of Lake Barrington, Illinois. My first interview was on July 9, 2010, during which Investor B stated that he had first invested with Cirigliano approximately three years ago. Investor B said that some of his investments with Cirigliano were for 30 days and others were ongoing. Investor B received promissory notes from Cirigliano after each investment.

6

15. On July 2, 2009, Investor B wire transferred $15,000 to Cirigliano for the purpose of investing in Cirigliano's purchase and sale of used video production equipment. Records from Home State Bank reveal that Investor B's wire transfer was credited to an account in the name of Panoptic Corporation. Prior to the deposit, the balance on the account was $1,718.94. Following the deposit, the account was used to make a car payment of $758.61 to Capital One Auto, $8,000 were used to pay another investor, $4,000 were used to pay the owner of the property where Panoptic Studios, Inc. operated, $4,500 were used to pay for Cirigliano's residence rent, and $3,900 were transferred to another Panoptic Studios, Inc. account.

16. Investor B advised me that in approximately July of 2010, he called Cirigliano to inquire about a $25,000 note that had been due on June 18, 2010, and which had not yet been paid. According to Investor B, Cirigliano requested additional time in which to pay the note and suggested that Investor B roll over the note for an additional 30 days. Investor B does not remember how much money he has invested with Cirigliano over the years but said that Cirigliano currently owes him approximately $300,000 in principal plus interest.

### Investor C

17. On January 14, 2011, I interviewed Investor C. Investor C, a resident of Bloomfield Hills, Michigan, related that he made his first investment with Cirigliano in or about May of 2009, and made additional investments later. Investor C stated that the terms of each of his investments with Cirigliano varied, but in general, Cirigliano promised to pay

10-12% return on 30 day investments. Investor C also said that Cirigliano offered him the option not to cash in on his investment at the end of the 30 days period and that his investment would automatically roll over for an additional 30 days period with a compounded interest. Investor C said that he had invested a total of approximately $50,000. To date, I have found banking records that reflect that Investor C invested a total of approximately $45,000 with Cirigliano.

18. Investor C said that Cirigliano said he had an investment opportunity related to Cirigliano buying used video production equipment from companies that were upgrading their equipment to digital and selling the old analog equipment to companies that were still using it. Investor C said that he had received promissory notes from Cirigliano after each investment via Federal Express and the United States mail.

19. On June 5, 2009, Investor C wired transferred $10,000 to Cirigliano for the purpose of investing in Cirigliano's purchase and resale of used video production equipment. Home State Bank records reflect that Investor C's wire transfer was credited to an account in the name of Panoptic Corporation. Prior to the deposit, the balance in the account was $3.64. Following the deposit, Cirigliano used Investor C's funds to pay $7,000 to another investor, $1,700 to another bank account of Panoptic Corporation, and $255.21 towards a telephone bill.

20. Investor C received an interest payment check in the amount of $14,049, dated September 4, 2009, drawn on the Panoptic Studios, Inc. Operating Account. This check was

returned by the Algonquin Bank and Trust for non-sufficient funds. On September 19, 2009, Cirigliano issued a replacement check drawn on the same account to Investor C for $14,049. Investor C indicated that this check cleared and that he has not received additional payments from Cirigliano since that check.

21. On February 15, 2011, I again interviewed Investor C. During that telephonic interview, Investor C advised me that when he had asked Cirigliano in 2010 to return Investor C's investment, Cirigliano had stated that the invested funds had been used to purchase equipment and that there was a problem with the closing of the sale of that equipment. Because of that problem, Cirigliano said he could not repay Investor C at that time.

**Investor D**

22. On November 24, 2010, Special Agent Lanham and I interviewed and received documents from an individual referred to here as Investor D. Investor D is a resident of Schaumburg, Illinois, and owned a Proforma franchise. Investor D said that he made his first investment with Cirigliano in or about June of 2009, and made an additional investment later. Investor D stated Cirigliano promised to pay a 20% return on 30 day investments. Investor D said he invested a total of approximately $41,000.

23. According to Investor D, Cirigliano said he had an investment opportunity related to buying used video production equipment from television companies that were upgrading their equipment to digital and selling the old equipment to smaller companies that

9

could still use it. Investor D said that after investing with Cirigliano, Investor D had received promissory notes reflecting the investments from Cirigliano via Federal Express.

24. On June 29, 2009, Investor D wire transferred 31,000 to Cirigliano for the purpose of investing in Cirigliano's purchase and resale of used video production equipment. Home State Bank records reflect that Investor D's wire transfer was credited to an account in the name of Panoptic Corporation. Prior to the deposit, the balance in the account was $23,018.43. The same date Investor D's funds were credited to the Panoptic Corporation account, two checks that Cirigliano had previously written to pay existing investors cleared the account, leaving an ending balance in the account of $2,518.43.

25. Investor D said he received approximately $30,000 in interest payments from Cirigliano in January 2010. Investor D indicated that in or about May of 2010, Cirigliano's interest payment checks started to be returned by Investor D's bank for non-sufficient funds. Investor D said that the last payment he received from Cirigliano was in August of 2010. Investor D said he was not sure as to how much money Cirigliano still owes him but he has received $20,000 more than the principal of his investment. Investor D stated that his wife had invested $14,000 with Cirigliano and that she has not received any return on her investment.

26. On February 10, 2011, Investor D sent an email to Special Agent Lanham in which Investor D stated that Cirigliano had recently told Investor D that Investor D's funds

were tied up in equipment that Cirigliano had purchased and that he was having a hard time selling.

### Investor E

27. On October 14, 2010, another law enforcement officer and I have interviewed and received documents from an individual referred herein as Investor E. Investor E, a resident of Elmhurst, Illinois, related that he first learned about Panoptic Studios and Cirigliano's investment opportunity through Investor D, a Proforma franchise owner. Investor E said he decided to arrange a meeting with Cirigliano to learn more about this investment. Investor E met with Cirigliano at which time Cirigliano said that television companies in the United States were upgrading their video equipment to high definition and that they were selling their old equipment at a very low price. Cirigliano claimed that this was a great opportunity to make a profit because the old equipment could be sold to companies that were not required to work with high definition equipment.

28. Investor E, an accountant, said that he related the information he obtained from Cirigliano to some of Investor E's clients who decided to invest jointly with Investor E in Cirigliano's opportunity. Investor E created a company by the name of A. O. Equipment Investors Corporation (hereinafter "A. O. Equipment") in order to invest and monitor the investments he and his clients were making with Panoptic Studios and Cirigliano.

29. On June 12, 2009, Investor E invested $10,000 with Cirigliano for the purpose of Cirigliano purchasing and reselling used video production equipment. Cirigliano

promised to pay Investor E 18% on their investments in 30 days. Investor E's $10,000 check, along with two other checks totaling $20,000, were deposited into the Special Account of Panoptic Studio, Inc. at Home State Bank. Prior to that deposit, the balance in the account was $2,218.13. After the $30,000 were deposited, Cirigliano wrote a check for $15,000 to another investor, a check for $7,000 payable to "Cash," and a check for $7,500 payable to "Cash."

30. On June 23, 2009, Investor E invested $50,000 with Cirigliano by wire-transferring the funds to the Special Account of Panoptic Corporation at Home State Bank. Prior to the deposit, the balance in the account was $123.43. Records from Home State Bank reflect that after the $50,000 were credited to the account, $7,500 were wire transferred to another investor and $8,150 were wire transferred to yet another investor. According the bank records, a $7,000 debit was authorized by Cirigliano's wife.

31. Cirigliano provided Investor E with an original demand note and with a subsequent updated demand note. The updated demand note was dated June 1, 2010, and was in the amount of $430,452 due on August 3, 2010. Investor E stated that after receiving the updated demand note, he believed that his investment had been profitable. On October 14, 2010, Investor E said that he had not received the $430,452 from Cirigliano.

32. A $25,000 check dated July 16, 2009, written on the account of one of the investors in A. O. Equipment, was deposited on July 17, 2009, into an account of Panoptic Studio's, Inc. at Home State Bank. This check represented the investment, in whole or in

part, of A. O. Equipment. Prior to the deposit, the balance in the account was $9,070.79. After the $25,000 check was deposited, $14,505 were wire transferred to another investor and $11,000 were transferred to the Special Account of Panoptic Studios, Inc. at Home State Bank.

### Investor F

33. Special Agent Lanham and I separately interviewed an individual referred to herein at "Investor F" and Investor F provided me with documents. Investor F is a resident of Vandalia, Ohio. Investor F advised me that from December 2007 to December 2008, he invested five times with Cirigliano for a total of $45,000. According to Investor F, Cirigliano promised to pay 1.5% return on 30 day investments. Investor F also said that Cirigliano offered him the option not to cash in on his investment at the end of the 30day period and that his investment would automatically roll over for an additional 30 days period with a compounded interest.

34. According to Investor F, Cirigliano said he had an investment opportunity related to buying used video production equipment from television companies that were upgrading their equipment to digital and selling the old equipment to smaller companies that could still use it. Investor F said after each investment with Cirigliano, he received a promissory note from Cirigliano via Federal Express.

35. On April 21, 2008, Investor F wrote a $10,000 check to Cirigliano in order to invest in Cirigliano's purchase and resale of used video production equipment. Home State

Bank records reflect that Investor F's check was credited to an account in the name of Panoptic Corporation. Prior to the deposit, the balance in the account was $3,125.32. Following the deposit, the account was used to make a car payment of $1,532.87 to Capital One Auto, $1,000 were transfer to the Special Account of Panoptic Corporation at Home State Bank, $968.33 were used to make a car payment to Ford Credit, and a $6,100 check was issued to Cirigliano's son.

36. Investor F said that in November of 2009, he asked Cirigliano for the return of his investment and interest. Investor F said that it took Cirigliano several months to pay back Investor F. Cirigliano's explanation to Investor F for the delay was that Investors F's funds were tied up because the buyer had not paid for the equipment due to installation problems. Investor F stated that Cirigliano eventually he did paid him back in full.

### Investor G

37. On January 25, 2011, Special Agent Lanham interviewed and received documents from an individual referred herein as Investor G. Investor G resides in Frankfort, Illinois. Investor G stated that he is a long-time friend of Investor D who had advised Investor G of the investment opportunity with Cirigliano. Investor G said that on August 14, 2009, he spoke with Cirigliano on the telephone. During that call, Cirigliano described the investment as buying and reselling non-high definition equipment. Cirigliano said that if Investor G decided to invest with Cirigliano, the investment would return 20% per month. Cirigliano further said that if the market went down and the profit would only be 10 to 12%,

Cirigliano would withdraw the investor's money so that they would not lose money. Investor G invested $25,000 with Cirigliano on August 17, 2009. After a month, Investor G received a check for $5,000 from Panoptic Studios. Investor G made a second investment of $75,000 in October of 2009. After that, Investor G received a check for $10,000 in April of 2010. Other than that, Investor said that he lost the remainder of his investments and that Cirigliano is no longer returning his telephone calls.

### Interview of Cirigliano

38. On July 8, 2010, Special Agent Lanham and I met Cirigliano at his place of business in Wauconda, Illinois. We asked if we could interview him and he agreed, but wanted the interview to be away from his business. We followed him to a nearby restaurant where we conducted an interview. I advised him that he was not under arrest and that he could stop the interview and leave at any time.

39. Cirigliano provided the following information:

    a. He owns Panoptic Studios and makes web-sites, videos, and digital media. He has been also been buying used marketing items, such as cameras and digital recording equipment, refurbishing them, and selling them for a profit. In order to purchase the equipment, he would seek investments, mostly from friends and relatives, and issue them a promissory note to pay principal plus 14-24% within 30 to 60 days. He had received roughly $300,000 from family and friends for these investments.

  b. When asked if he could provide the names of the suppliers of the cameras and digital equipment he had purchased, he was unable to recall any names.

  c. When asked why he used the name "Paul Cirano" instead of his true name, Paul Cirigliano, he said it was because Cirigliano was too difficult for people to remember and pronounce, so he went by Paul Cirano.

After serving him with a subpoena, the interview ended.

### Cirigliano's Criminal History

40. According to law enforcement indices, Paul Cirigliano has the following criminal history:

  a. In 1991, Paul Cirigliano was charged with wire fraud and failing to file a currency transaction report ("CTR") in the United States District Court in Rhode Island. He pleaded guilty to the CTR offense and was sentenced to 46 months in federal prison.

  b. In 1992, Paul Cirigliano was convicted of second degree felony larceny in the 12th Circuit Court in Sarasota, Florida, and sentenced to 2 years and 9 months in state prison.

### Cirigliano's Plans to Move to Costa Rica

41. On February 4, 2011, Special Agent Lanham spoke with the owner of the office building at 26370 N. Route 59, Wauconda, Illinois, where Panoptic Studios is located. The owner stated that earlier that day he had observed Cirigliano boxing up the contents of his office and loading them into a moving truck. The owner also said that Cirigliano owes him

approximately $20,000 in past rent for Panoptic Studios. The owner stated when he confronted Cirigliano about the unannounced move and the past due rent, Cirigliano stated that he needed a fresh start and that he and his son were moving to Costa Rica. Cirigliano said he had a big contract with Proforma that was going to pay him $200,000 soon and that he would wire the rent from Costa Rica to the owner. Cirigliano said he was leaving for Costa Rica at the end of the month.

## Conclusion

42. In brief summary, there is probable cause to believe that Cirigliano devised and participated in a scheme to defraud and to obtain money by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing and attempting to execute the scheme to defraud and to obtain money by means of materially false and fraudulent pretenses, representations and promises, did on or about March 26, 2009, cause to be delivered by U.S. mail an envelope containing a personal check drawn upon Investor A's bank account, addressed to Cirigliano's address on N. Route 59, Wauconda, Illinois, 60084, in violation of Title 18, United States Code, Section 1341.

_____
EDUARDO M. ANDRADE
Postal Inspector
U. S. Postal Inspection Service

Subscribed and sworn to before me on February 17TH, 2011.

*P. Michael Mahoney* (signature)
P. MICHAEL MAHONEY
United States Magistrate Judge